**UNITED STATES DISTRICT COURT**
**WESTERN DIVISION OF LOUISIANA**
**SHREVEPORT DIVISION**

| | |
|---|---|
| SIMEON H. WALL, SR., M.D. | CIVIL ACTION NO. 06-2365 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY | MAGISTRATE JUDGE HORNSBY |

**MEMORANDUM RULING**

Before the Court is a Motion for Summary Judgment (Record Document 26) filed by the defendant, Northwestern Mutual Life Insurance Company ("Northwestern"). The plaintiff, Dr. Simeon H. Wall, Sr. ("Dr. Wall"), opposed the Motion for Summary Judgment. See Record Document 36. For the reasons which follow, the Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.

**BACKGROUND**

In November 1988, Northwestern issued the first disability insurance policy ("the First Policy") to Dr. Wall. The First Policy provides a monthly benefit for total disability of $4,000 and proportionate benefits for partial disability. Specifically, it requires that written notice of claim be given within 60 days of the onset of a covered loss and that proof of disability be given within 90 days after the end of each monthly period for which benefits are claimed. Under the First Policy, Dr. Wall was entitled to proportionate benefits for partial disability if he could show, among other requirements, that he became disabled while the First Policy was in force; he was under the care of a licensed physician other than himself; his disability resulted from an accident or sickness; he was unable to perform one or more of the principal duties of his occupation or to spend as much time at his occupation as he did before the disability started; and he had at least a 20% loss of earned income.

Karen Bedwell Herhahn ("Herhahn"), who had been friends with Dr. Wall since the mid-1970s, was the Northwestern financial representative who took his application for the First Policy and delivered the original of the policy to him.

In July 1993, Dr. Wall applied to Northwestern, through Herhahn, for an additional $4,000 per month in disability insurance coverage. On July 15, 1993, he underwent an examination by a paramedical examiner, James Crone ("Crone"). Dr. Wall gave answers to the questions on the Declarations to Medical Examiner form (the "medical questionnaire") and Crone recorded the answers. For the most part, Dr. Wall gave negative answers to all the questions in the medical questionnaire, specifically denying that he was using any medications or drugs; that in the last ten years he had or had been medically treated for persistent shortness of breath, chest pain, discomfort, or tightness, palpitation, high blood pressure, heart murmur, heart attack, or other disorder of the heart or blood vessels; and that in the past five years – except as otherwise disclosed – he had been examined, advised, or treated by a physician or other medical practitioner; been a patient in a hospital, clinic, or medical facility; had an EKG, x-ray, or other test; or been advised to have any tests, hospitalization, or surgery which had not been completed. Dr. Wall signed the medical questionnaire, attesting:

> I declare that my answers and statements are correctly recorded, complete and true to the best of my knowledge and belief. Statements in this application are representations and not warranties.

Record Document 27 at 108.

Effective July 16, 1993, Northwestern issued the Second Policy, which provided a $4,000 monthly benefit and contained comparable requirements to those in the First Policy regarding partial disability, notice of claim, and proof of disability, and included a "Time

Limit on Certain Defenses" provision, which stated:

> In issuing this policy, the Company has relied on the application. The Company may rescind the policy or deny a claim due to a misstatement in the application. However, after this policy has been in force for two years from the Date of Issue, no misstatement, except a fraudulent misstatement, in the application may be used to rescind the policy or to deny a claim for a disability or loss that starts after the two year period.

Id. at 100. Northwestern delivered the original of the Second Policy to Dr. Wall. He never contacted Northwestern to advise of any errors in his disclosures during the application process.

From the late 1990s through the end of 2005, Northwestern contends that Dr. Wall worked on a full-time basis as a plastic surgeon. During this time, he repeatedly informed hospitals and his malpractice insurer that he did not have any health problems affecting his practice and was able to perform all aspects of plastic surgery. Dr. Wall contends that he made these representations in order to obtain his privileges and to keep his malpractice insurance. He also maintains that he self-limited his practice during this time.

Dr. John Hardin, III ("Dr. Hardin") was Dr. Wall's treating cardiologist from January 1, 1999 to December 31, 2004. Dr. Hardin's medical records show that Dr. Wall's coronary artery disease was stable and did not result in any restrictions or limitations during this time period. Dr. Hardin admitted that he was not aware of anything preventing Dr. Wall from safely treating patients during this time period.

In November 2005, Dr. Wall notified Northwestern of his intention to seek proportionate benefits for partial disability for the time period of January 2, 1999 to December 31, 2004. Dr. Wall told Northwestern that he had reduced his workload as a plastic surgeon due to coronary artery disease, had stopped taking emergency calls and

performing hand surgeries and microsurgery, and had suffered at least a 20% loss of income. In his Request for Disability Benefits form, Dr. Wall asserted that he first saw Dr. Anil Chhabra ("Dr. Chhabra") in July 1993 and that the first symptoms of his disabling sickness appeared on August 27, 1993. Northwestern acknowledged receipt of the claim forms, pointed out Dr. Wall's failure to submit his claim on time, and began its evaluation of his entitlement to benefits.

During the evaluation, Northwestern obtained medical records from Dr. Chhabra establishing that Dr. Wall had been less than truthful about his medical condition during the application process for the Second Policy. Herhahn, a Northwestern financial representative, testified in her deposition that had she known of Dr. Wall's coronary artery disease, she would not have submitted his application to Northwestern because she knew "he would be denied." Northwestern underwriter Steven Kien also stated that had Northwestern been aware of Dr. Wall's medical condition, the Second Policy never would have been issued.

Northwestern concluded that Dr. Wall made fraudulent misrepresentations for the purpose of deceiving or inducing it to issue the Second Policy and upon which it relied in issuing the Second Policy. By letter dated June 15, 2006, Northwestern gave notice to Dr. Wall that it was rescinding the Second Policy and refunded, with interest, the premiums that had been paid for it. On June 27, 2006, Dr. Wall cashed the rescission check and placed the funds into an escrow account.

By letter dated June 15, 2006, Northwestern informed Dr. Wall that it was denying his claim under the First Policy. The letter stated in pertinent part:

> To be considered partially disabled your contracts require you to be unable

to perform one or more of the principal duties of your occupation or to spend at [sic] much time at your occupation as you did before the disability started. Unfortunately, based on all of the information in the claim file [we] have been unable [to] identify any period in which you would have met the definition of partial disability.

We recognize that you have coronary artery disease. This is supported by the medical documentation on file. However, having a condition alone is not proof of disability. As noted above, your contracts require you to provide proof that your condition is so significant that it causes you to be unable to perform one or more of your principal duties or caused you to be unable to spend as much time performing your principal job duties as you had previously. Unfortunately, we do not find such proof. Without proof of disability, we are unable to approve your disability claim.

Record Document 27 at 203.

On November 29, 2006, Dr. Wall filed a Petition for Damages for Breach of Contract and for Penalties and Attorney Fees in the First Judicial District Court, Caddo Parish, Louisiana. See Record Document 2. Northwestern answered and filed its own counterclaim, seeking a declaratory judgment that the Second Policy is rescinded, on December 22, 2006. See Record Document 1. A removal order was entered on December 29, 2006. See Record Document 12.[1] Northwestern filed the instant Motion for Summary Judgment on January 31, 2008. See Record Document 26.

**LAW AND ANALYSIS**

**I.      Summary Judgment Standard.**

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material

---

[1]Jurisdiction in this case is based on 28 U.S.C. § 1332. See Record Document 4 at 3. Thus, the Court, under Erie, is bound to apply Louisiana substantive law. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817 (1938).

fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Stahl v. Novartis Pharm. Corp., 283 F.3d 254, 263 (5th Cir. 2002). If the movant demonstrates the absence of a genuine issue of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Littlefield v. Forney Indep. Sch. Dist., 268 F.3d 275, 282 (5th Cir. 2001). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Alton v. Tex. A&M Univ., 168 F.3d 196, 199 (5th Cir. 1999).

## II. Breach of Contract Claims.

### A. Rescission of Second Policy.

#### 1. Fraudulent Misstatements.

Northwestern contends that it is entitled to summary judgment because Dr. Wall made several fraudulent misstatements during the application process that entitle it to rescind the Second Policy. Conversely, Dr. Wall maintains that he never intended to deceive Northwestern and/or that any misstatements were not material.

Section 7.2 of the Second Policy provides:

> In issuing this policy, the Company has relied on the application. The Company may rescind the policy or deny a claim due to a misstatement in the application. However, after this policy has been in force for two years from the Date of Issue, no misstatement, except a fraudulent misstatement,

> in the application may be used to rescind the policy or to deny a claim for a disability or loss that starts after the two year period.

Record Document 27 at 100. To prevail on its rescission counterclaim, Northwestern bears "the burden of establishing that false statements were made with an actual intent to deceive and that the facts were material." Henry v. State Farm Mut. Auto. Ins. Co., 465 So.2d 276, 278 (La.App. 3 Cir. 1985) (citation omitted); see also Darby v. Safeco Ins. Co. of Am., 545 So.2d 1022, 1025-1026 (La. 1989). "The intent to deceive must be determined from surrounding circumstances which indicate the insured's knowledge of the falsity of the representations made in the application and his recognition of the materiality of his misrepresentations, or from circumstances which create a reasonable assumption that the insured recognized the materiality." Henry, 465 So.2d at 278 (citations omitted). To determine materiality, courts must consider "whether knowledge of the facts would have influenced the insurer in determining whether to assume the risk or in fixing premiums." Id. (citations omitted).

The summary judgment record establishes that Dr. Wall made false statements to Northwestern during the application process for the Second Policy.[2] On July 15, 1993, Dr. Wall responded to Northwestern's questions on the medical questionnaire and answered

---

[2] In opposing the Motion for Summary Judgment, Dr. Wall contends that the medical questionnaire relating to the 1993 disability policy was not a part of the original application that he filled out and sent to Northwestern. See Record Document 36 at 4, n. 1. The Court rejects this argument. As noted by Northwestern in its reply brief, the questionnaire contains a declaration sentence immediately preceding Dr. Wall's signature that references "this application." Record Document 40 at 4, citing Record Document 27 at 108. The questionnaire was also attached to and made a part of the Second Policy at the time it was delivered to Dr. Wall. See Record Document 27 at 21 & 312. Finally, the questionnaire begins with question 31, while the numbering of the questions on an earlier page of the application left off at question 30. See id. at 106, 108.

"no" to the following questions:

    32.    Are you using any medications or drugs?

    33.    In the last 10 years, have your had or have you been medically treated for:

            D.    Chest pain, discomfort or tightness, palpitation, high blood pressure, heart murmur, heart attack or other disorder of the heart or blood vessels?

    36.    Other than above, have you within the past 5 years:

            A.    Had any physician, psychiatrist, psychologist, chiropractors or other medical practitioner examine, advise or treat you?
            B.    Been a patient in a hospital, clinic or medical facility?
            C.    Had an EKG, x-ray, or other test?
            D.    Been advised to have any test, hospitalization, or surgery which was not completed?

Record Document 27 at 108. Dr. Wall's negative answers are contradicted by Dr. Chhabra's medical records, which reveal that Dr. Wall had been, in the two months prior to completing the medical questionnaire, prescribed five medications, been diagnosed with coronary artery disease, received treatment for that condition, undergone extensive diagnostic testing, been hospitalized, and received a recommendation to undergo open heart surgery.[3] See id. at 225-236. Further, in his deposition, Dr. Chhabra testified that there was no doubt in his mind that as of July 15, 1993, Dr. Wall was aware that he had severe coronary artery disease and was aware of the recommendation that he undergo open heart surgery. See id. at 218. Dr. Wall's answers to at least six questions of the medical questionnaire were misstatements. Dr. Wall even admitted in his deposition that he did not tell Crone, the paramedical examiner, of his diagnosis of coronary artery disease

---

[3] The authenticity and accuracy of Dr. Chhabra's records have not been challenged by either party.

or the recommendation of surgery. See id. at 18.[4] The Court finds that Northwestern has met its burden of establishing that false statements were made. See Henry, 465 So.2d at 278.

The Court now turns to materiality. Again, the test of materiality considers "whether knowledge of the facts would have influenced the insurer in determining whether to assume the risk or in fixing premiums." Id. (citations omitted); see also Wohlman v. Paul Revere Life Ins. Co., 980 F.2d 283, 286 (5th Cir. 1992). "If the information given by the applicant is false, but the insurance company would have issued the policy anyway, then it is not material." Wohlman, 980 F.2d at 286 (citations omitted). False answers to questions regarding consultations with physicians and hospitalization have been definitely held to be material. See Henry, 465 So.2d at 278. In Pendarvis v. Continental Service Life & Health Ins. Co., 339 So.2d 367 (La.App. 1 Cir. 1976), the court reasoned:

> As [to] . . . medical history discloses, the answers given to the four questions . . . were false. Further, the medical director for Continental testified that had he known of the medication [the plaintiff] was taking he would have rejected the application and had he known of the EKGs, he would have requested them and investigated further. The fair inference is that a true answer to any of the four questions would have disclosed [the plaintiff's] heart condition and prompted rejection of his application; therefore, the misstatements were . . . material.

Id. at 369.

Relying on an Underwriting Referral prepared by Kien in April 2006, Northwestern

---

[4] Dr. Wall also notes that he did not personally record the information on the medical questionnaire, but rather relied on Crone to complete the medical questionnaire for him. See Record Document 36 at 6. This is no excuse for the false statements because under Louisiana law, "one who signs an instrument without reading it has no complaint." Tweedel v. Brasseaux, 433 So.2d 133, 138 (La. 1983); see also Hartford Acc. and Indem. Co. v. La. Minority, Inc., 522 So.2d 1154, 1156 (La.App. 4 Cir. 1988). Here, Dr. Wall does not contest that he signed the questionnaire. See Record Document 36 at 6.

argues that Dr. Wall's misstatements were material to its underwriting determination. In response, Dr. Wall simply argues that "Northwestern has not offered any evidence to this Court – and, indeed, Northwestern has no evidence whatsoever – to show that it somehow conveyed to Dr. Wall the materiality of other insurance." Record Document 36 at 7. Dr. Wall's argument is misplaced, as the test of materiality focuses on the knowledge of the insurer, not the insured. See Henry, 465 So.2d at 278; Wohlman, 980 F.2d at 286. Kien's Underwriting Referral unequivocally states that had Northwestern been aware of the undisclosed suggestive chest pain symptoms; positive thallium stress test results; catheterization results confirming multiple vessel coronary artery disease; confirmed diagnosis of multiple vessel coronary artery disease for which bypass graft surgery was suggested; and the initial heart catheterization and angiographic study performed on May 26, 1993 that demonstrated a lesion of the left circumflex, the Second Policy would have been declined. See Record Document 27 at 376-377. Based on this undisputed evidence, the Court finds that Northwestern has met its burden of establishing materiality.

The final inquiry is whether Dr. Wall made the material false statements in the application with the intent to deceive. The Henry case states that "[t]he intent to deceive must be determined from surrounding circumstances which indicate the insured's knowledge of the falsity of the representations made in the application *and* his recognition of the materiality of his misrepresentations, or from circumstances which create a reasonable assumption that the insured recognized the materiality." Id. (emphasis added). "Summary judgment is seldom appropriate for determinations based on subjective facts, such as motive, intent, good faith, knowledge and malice." Smith v. Our Lady of the Lake Hosp., Inc., 93-2512 (La. 7/5/94), 639 So.2d 730, 751; see also Jones v. Estate of

Santiago, 2003-1424 (La. 4/14/04), 870 So.2d 1002, 1006; Lyxell v. Vautrin, 604 F.2d 18, 20 (5th Cir. 1979) ("Cases in which the underlying issue is one of motivation, intent, or some other objective fact are particularly inappropriate for summary judgment."). Yet, in rare instances, "summary judgment may be granted on subjective intent issues when no issue of material fact exists concerning the pertinent intent." Smith, 639 So.2d at 751; Jones, 870 So.2d at 1006.

The summary judgment record establishes that Dr. Wall knew of the falsity of the representations made in the application. He admitted in his deposition that at the time he applied for the Second Policy, he was aware of all of the treatment and testing he had undergone with Dr. Chhabra and the diagnosis of coronary artery disease. See Record Document 27 at 14-15. Yet, the Court finds that there are genuine issues of material fact that preclude summary judgment on the issue of Dr. Wall's recognition of the materiality of his misrepresentations. Northwestern argues that this is a case where intent to deceive can be found as a matter of law, yet Dr. Wall has presented evidence that the application process was a mere formality and that he was lead to believe that the contents of his application were meaningless. Specifically, Dr. Wall testified in his deposition that Northwestern, namely Herhahn, insinuated that he would receive additional disability insurance, regardless of his health:

> Q. And it is your testimony that Ms. Herhahn or somebody with Northwestern . . . told you that you were entitled to guaranteed acceptance.
>
> A. You know, the thing about it, it was sort of insinuated that, you know, we'll sell you more insurance in spite of whatever your health is, but it was never written down an dit was never checked on my policies as such; but they said you should not have any problems buying more health insurance from us. I mean, we're in the business of selling

> insurance and we want to sell insurance to you and you, you're eligible to buy more insurance.
>
> . . .
>
> I would say that Ms. Karen Herhahn insinuated that I would not have any problems buying health insurance in the future.

Record Document 37 at 6 SW. Dr. Wall also testified that it was represented to him that Northwestern would rely on a 1992 physical examination, not the 1993 medical questionnaire, in relation to his Second Policy. See id. at 4-5 SW. This evidence is sufficient to create fact and credibility questions as to Dr. Wall's recognition of the materiality of his misrepresentations and/or the Court's ability to determine from the surrounding circumstances whether there is a reasonable assumption that Dr. Wall recognized the materiality. Accordingly, summary judgment must be denied.

### 2. Accord and Satisfaction.

Irrespective of Dr. Wall's intent to deceive, Northwestern argues that it is entitled to summary judgment because Dr. Wall cashed the premium-refund check, resulting in an accord and satisfaction. Dr. Wall disagrees, maintaining that the premium-refund check did not expressly state that it was in full and final payment for any disputed amount. Further, he contends that there was no mutual consent of the parties.

"An accord and satisfaction is a contract . . . terminating a dispute between the parties over obligations claimed due under a previous contract." Fischbach and Moore, Inc. v. Cajun Elec. Power Co-op., Inc., 799 F.2d 194, 198 (5th Cir. 1986). Professor Saul Litvinoff has noted that an accord and satisfaction is like any other contract and "the words and acts of the parties . . . have to be interpreted in order to ascertain whether there was sufficient offer and acceptance." Id., citing S. Litvinoff, 6 *Louisiana Civil Law Treatise:*

*Obligations I* (1969), § 384, at 648. The doctrine is proven when there is a disputed claim; the debtor's tendering of a sum less than that claimed by the creditor; and the creditor's acceptance of the payment. See id.; Precision Drywall & Painting, Inc. v. Woodrow Wilson Construction Co., 2003-0015 (La.App. 3 Cir. 4/30/03), 843 So.2d 1286, 1288. Recent Louisiana case law has emphasized the importance of determining the mutual consent of the parties, which is an essential issue of fact. See Fischbach and Moore, 799 F.2d at 198. Courts have consistently held that "mutual consent is an absolute requisite to the formation of a contract of accord and satisfaction, and that the intent of the parties is a question of fact to be resolved by the trier-of-fact." Id.; see also Cowley Corp. v. Shreveport Packing Co., 440 So.2d 1345, 1352 (La.App. 2 Cir. 1983); Spalitta v. Hartford Fire Ins. Co., 428 So.2d 824, 826 (La.App. 5 Cir. 1983); McClelland v. Security Industrial Ins. Co., 426 So.2d 665, 670 & n. 2 (La.App. 1 Cir. 1982); Adams v. Sconza, 380 So.2d 679, 680 (La.App. 4 Cir. 1980); Pieri v. DiMaggio, 331 So.2d 59, 60 (La.App. 4 Cir. 1976); Antoine v. Elder Realty Co., 255 So.2d 625, 629 (La.App. 3 Cir. 1971); U.S. v. Bloom, 112 F.3d 200, 206 (5th Cir. 1997). An accord and satisfaction "does not come into fruition until there has been a focusing of two minds upon the same object with th manifested intent to agree thereon." Fischbach and Moore, 799 F.2d at 198.

By letter dated June 15, 2006, Northwestern informed Dr. Wall that it was rescinding the Second Policy based on Section 7.2 provision relating to time limits on certain defenses:

> In issuing this policy, the Company has relied on the application. The Company may rescind the policy or deny a claim due to a misstatement in the application. However, after this policy has been in force for two years from the Date of Issue, no misstatement, except a fraudulent misstatement, in the application may be used to rescind the policy or to deny a claim for

> disability or loss that starts after the two-year period. In addition, a claim may be denied on the basis that a disability or loss is caused by a Pre-Existing Condition (see Section 2.1).
>
> The rescission of your policy means that, legally, your policy is deemed to have never existed. Accordingly, we are refunding to you all premiums you have paid.
>
> I have enclosed a check for Policy D982824 in the amount of $56,455.31 representing a refund of all premiums paid, with interest in the amount of $12,306.83.

Record Document 27 at 197-198. The memo line of the check, which was cashed by Dr. Wall, provided:

> RETURN OF PREMIUM WITH INTEREST FOR RESCISSION OF POLICY D982824

Id. at 199. After cashing the check, Dr. Wall placed the funds into a newly opened interest bearing escrow CD account, such that the "premium and interest that needs to be returned to Northwestern Mutual will be available in such escrow." Record Document 37 at 27 SW. Further, in a September 2006 letter to Northwestern, Dr. Wall repeatedly references Northwestern's "attempt" to rescind D982824, as compared to the agreed upon rescission of D982824. Id. at 25-27 SW.

The Court concludes that summary judgment is inappropriate as to Northwestern's affirmative defense of accord and satisfaction. There is a genuine issue of material fact as to Dr. Wall's intent in cashing the premium-refund check. First, the premium-refund check did not contain a "full and final payment" notation, but instead read, "RETURN OF PREMIUM WITH INTEREST FOR RESCISSION OF POLICY D982824." Moreover, the Court must look to the words and acts of both Northwestern and Dr. Wall to ascertain whether there was sufficient offer and acceptance. See Fischbach and Moore, 799 F.2d

at 198. Here, Dr. Wall placed the returned premiums and interest into an escrow account so that the money could be returned to Northwestern. While the Court expresses no opinion on Dr. Wall's intent, this act seems to indicate Dr. Wall's belief that his dispute with Northwestern was ongoing and that he had not negotiated the check in full settlement of the dispute. It is for the trier-of-fact, and not this Court at the summary judgment stage, to find whether Dr. Wall possessed the requisite intent. Summary judgment is denied.

The Motion for Summary Judgment is denied as to Northwestern's rescission of the Second Policy. Thus, the Court must move to Northwestern's alternative argument that Dr. Wall is not entitled to disability benefits under either policy.

### B.     Denial of Disability Claim.

Northwestern argues that regardless of the Court's finding as to the rescission of the Second Policy, it is entitled to summary judgment because Dr. Wall did not comply with the applicable provisions regarding Notice of Claim and Proof of Disability, he failed to file the instant action on time, and he was not partially disabled by his coronary artery disease.

####      1.     Notice of Claim and Proof of Disability.

Northwestern contends that Dr. Wall failed to give it timely notice of his claim or proof that he was disabled. Conversely, Dr. Wall maintains that this arguments fails because Northwestern has not established that it suffered actual prejudice.

The Notice of Claim and Proof of Disability provisions of both policies state:

**4.1 NOTICE OF CLAIM**
Written notice of claim must be given to the Company within 60 days after the start of any loss covered by this policy. If the notice cannot be given within 60 days, it must be given as soon as reasonably possible.

. . .

**4.3 PROOF OF DISABILITY**
> Written proof of disability must be given to the Company within 90 days after the end of each monthly period for which benefits are claimed. If the proof is not given within the 90 days, the claim will not be affected if the proof is given as soon as reasonably possible.

Record Document 27 at 62, 98. In the Second Policy, the Proof of Disability provision further provided: "In any event, the proof required must be given no later than one year after the end of each monthly period for which benefits are claimed unless the Owner was legally incapacitated." Id. at 98.

Based of these provisions, Dr. Wall's initial notice in November 2005 was untimely, as his alleged disability began on January 1, 1999. However, under Louisiana law, "an insurer must prove actual prejudice in order to deny a claim on the basis of not receiving notice within the time limits specified in the policy." Deville v. Life Ins. Co. of Va., 560 So.2d 690, 693 (La.App. 3 Cir. 1990); see also Powell v. Automotive Cas. Ins. Co., 92-284 (La.App. 3 Cir. 2/2/94), 631 So.2d 581, 585; Fakouri v. Ins. Co. of N. Am., 378 So.2d 1083 (La.App. 3 Cir. 1979); Kinchen v. Dixie Auto Ins., 343 So.2d 263 (La.App. 1 Cir. 977). Northwestern has come forward with no specific evidence setting forth the prejudice it suffered due to Dr. Wall's delay. Accordingly, summary judgment must be denied.

**2.     Timeliness of Suit.**

The Legal Actions provision of both policies states:

**4.7 LEGAL ACTIONS**
> No legal action may be brought for benefits under this policy within 60 days after written proof of disability has been given. No legal action may be brought after three years (or a longer period that is required by law) from the time written proof is required to be given.

Record Document 27 at 62, 98. Northwestern argues that Dr. Wall's claims are barred

under this provision because he did not file the instant action within three years of April 30, 1999, the purported deadline to provide proof of loss for an alleged disability beginning on January 1, 1999. Yet, Dr. Wall contends that this lawsuit is timely, as he filed suit on November 29, 2006, which was within three years of the date he sent written proof of loss to Northwestern, i.e., November 25, 2005.

Here, while Dr. Wall's untimely notice of claim and proof of disability were excused because of Louisiana's jurisprudential rule of actual prejudice, there is no such equivalent for the timely filing of a legal action. Section 4.7 of both policies required that Dr. Wall file his legal action within three years "from the time written proof is required to be given." Record Document 27 at 62, 98. Dr. Wall alleges that his disability began on January 1, 2999; thus, his written proof of loss was to be filed no later than April 30, 1999 and his legal action was to be filed no later than April 30, 2002. Dr. Wall did not meet these deadlines and has provided no legally recognizable excuse for his delay.[5] Accordingly, summary judgment is granted as to Northwestern's claim that Dr. Wall failed to file the instant legal action within the time limits provided by Section 4.7 of the policies, resulting in the dismissal of Dr. Wall's claims.[6]

---

[5] Dr. Wall argues that he did not realize until November 2005 that he could seek disability benefits under the policies. See Record Document 36 at 15. He maintains that he "finally came forward and submitted a claim of disability" because he spoke with his accountant, who suggested that he file a disability claim. Id. at 13. While this appears to be an assertion of *contra non valentem*, the Court notes that Louisiana Civil Code Article 3492, upon which the doctrine of *contra non valentem* is based, applies to delictual actions and not actions for breach of contract.

[6] The Court did not reach Northwestern's argument that Dr. Wall was not partially disabled by his coronary artery disease under the terms of the policies, as it held that his legal action was not timely filed.

**III. Claims under Louisiana Revised Statutes 22:657 and 22:1220.**

Northwestern argues that it is entitled to summary judgment on Dr. Wall's claims for bad faith and recovery of penalties and attorney's fees under Louisiana Revised Statutes 22:657 and 22:1220. Section 657(A) provides in pertinent part:

> All claims arising under the terms of health and accident contracts issued in this state . . . shall be paid not more than thirty days from the date upon which written notice and proof of claim, in the form required by the terms of the policy, are furnished to the insurer unless just and reasonable grounds, such as would put a reasonable and prudent businessman on his guard, exist. . . . Failure to comply with the provisions of this Section shall subject the insurer to a penalty payable to the insured of double the amount of the health and accident benefits due under the terms of the policy or contract during the period of delay, together with attorney's fees to be determined by the court.

La. R.S. 22:657(A). Section 657(E) further provides that "[n]o action for the recovery of penalties or attorney fees provided in this Section shall be brought after the expiration of one year after the date proofs of loss are required to be filed." La. R.S. 22:657(E). As stated previously, Dr. Wall alleges that his disability began on January 1, 1999; thus, his written proof of loss was to be filed no later than April 30, 1999. To recover under Section 657(E), Dr. Wall should have filed his legal action no later than April 30, 2000. Dr. Wall did not meet this deadline and has provided no legally recognizable excuse for his delay. Accordingly, summary judgment in favor of Northwestern is granted as to Dr. Wall's Section 657 claim.

Dr. Wall also relies on Section 1220 in support of his claim for penalties and attorney's fees. Section 1220(D) provides that "[t]he provisions of [La. R.S. 22:1220] shall not be applicable to claims made under health and accident insurance policies." La. R.S. 22:1220(D); see also Sutherland v. U.S. Life Ins., 263 F.Supp.2d 1065, 1070 (E.D.La.

2003). Louisiana Revised Statute 22:6(2)(a) defines a health and accident plan as "[i]nsurance . . . against bodily injury, disablement, or death by accident . . . or against disablement . . . resulting from sickness or old age . . . and every insurance appertaining thereto." La. R.S. 22:6(2)(a). Accordingly, Section 1220 is inapplicable to this case and summary judgment is granted.

## CONCLUSION

Based on the foregoing, the Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**. The motion is **DENIED** as to the rescission of the Second Policy, but **GRANTED** as to Northwestern's claim that Dr. Wall failed to file the instant legal action within the time limits set forth in Section 4.7 of the policies. The motion is further **GRANTED** as to Dr. Wall's claims pursuant to La. R.S. 22:657 and 22:1220.

Accordingly, all of Dr. Wall's claims are **DISMISSED**. A judgment consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 29th day of September, 2008.

_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE